UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| BRANDON J. JAEGER, | CASE NO. 1:21-CV-02406-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Brandon J. Jaeger filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On December 27, 2021, pursuant to Local Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. (Non-document entry dated Dec. 27, 2021). On May 11, 2022, the parties consented to my jurisdiction. (ECF #9). Following review, and for the reasons stated below, I **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Mr. Jaeger filed for DIB and SSI on October 29, 2019, alleging a disability onset date of October 1, 2016. (Tr. 154-55, 156-62). The claims were denied initially and on reconsideration.

1

(Tr. 51-64, 68-79). He then requested a hearing before an administrative law judge. (Tr. 105-06). Mr. Jaeger (represented by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on November 10, 2020. (Tr. 29-49). On December 21, 2020, the ALJ issued a written decision finding Mr. Jaeger not disabled. (Tr. 10-28). The Appeals Council denied Mr. Jaeger's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Mr. Jaeger timely filed this action on December 27, 2021. (ECF #1).

FACTUAL BACKGROUND

I.      PERSONAL AND VOCATIONAL EVIDENCE

Mr. Jaeger was 22 years old at the time of his alleged onset date, and 27 years old at the time of the administrative hearing. (Tr. 34, 51). Mr. Jaeger stopped attending school in the 10th grade and has not obtained his GED. (Tr. 34). Mr. Jaeger has previously worked as a dishwasher, but the employment does not qualify as past relevant work. (Tr. 36, 47).

II.     RELEVANT MEDICAL EVIDENCE

On September 16, 2016, Mr. Jaeger was admitted to Northcoast Behavioral Healthcare for restoration to competency after being found incompetent to stand trial against a charge of disorderly conduct. (Tr. 237). According to the Discharge Narrative Summary, Mr. Jaeger was evaluated at a detention center and based on observations of thought disorganization, paranoia, and low frustration tolerance, was determined unable to understand the nature and objective of the legal proceedings and unable to assist in his defense. (*Id.*). The evaluating doctor noted Mr. Jaeger was unable to respond to questions in a relevant and coherent manner, did not possess

2

adequate attention and concentration to follow court proceedings, and appeared distracted by internal stimuli. (*Id.*).

Over the course of his stay at Northcoast, Mr. Jaeger became increasingly stable. (Tr. 241). Other than a single altercation instigated by another patient, Mr. Jaeger kept to himself and was frequently alone in his room. (Tr. 241-42). He was assessed with schizophrenia, marked by prominent symptoms of paranoia. (Tr. 242). Mr. Jaeger was restored to competency and discharged on October 14, 2016, with a prescription for Risperdal. (Tr. 237, 242). On discharge, Mr. Jaeger had partial insight but remained suspicious of others and was unsure whether his feelings came from his own mind. (*Id.*). He exhibited marginal grooming and hygiene, with long, malodorous facial hair. (*Id.*). He was cooperative, maintained good eye contact, displayed a euthymic mood with slightly blunted affect, and his thought process was organized and goal-directed. (*Id.*). He did not report feelings of paranoia or hallucinations, made no delusional statements, and did not appear to be internally stimulated. (*Id.*). He was alert and oriented, performed well on formal cognitive testing of attention and short-term memory, maintained adequate concentration and remained focused during the interview, and answered questions in a logical, relevant manner. (*Id.*). Mr. Jaeger's insight into his mental illness was limited and his judgment was fair. (*Id.*).

In November 2016, Mr. Jaeger met with Otto Kausch, M.D., for a psychiatric evaluation. (Tr. 252-53). Mr. Jaeger endorsed feeling stable on Risperdal and denied hallucinations but had poor energy levels. (Tr. 252). He continued to experience some paranoia, but maintained it was minor compared to before. (*Id.*). Mr. Jaeger presented as casually dressed and unshaven, but otherwise appropriately groomed. (Tr. 253). Mental status examination revealed average social skills, no negative symptoms of schizophrenia, spontaneous and normal speech, intact language,

3

impaired judgment, good insight, neutral affect, intact memory, normal attention span and concentration, and logical, coherent thoughts. (*Id.*). He did not appear depressed or manic, did not have suicidal thoughts, was alert and oriented, had some mild psychosis, and was cognitively intact. (*Id.*). Dr. Kausch gave Mr. Jaeger some Latuda samples to try. (*Id.*).

At a follow-up appointment on November 10, 2016, Mr. Jaeger reported improvements since starting Latuda, including no longer feeling paranoid, better energy levels, and an okay mood. (Tr. 252). He otherwise endorsed problems getting to sleep. (*Id.*). He presented as calm, quiet, and pleasant, and was casually dressed and unshaven but otherwise appropriately groomed. (*Id.*). He displayed average social skills, improved psychosis, logical and coherent thoughts, and intact cognition. (*Id.*). Dr. Kausch discontinued Risperdal, prescribed Latuda, and suggested melatonin for sleep. (*Id.*).

On November 21, 2016, Mr. Jaeger reported doing well. (Tr. 251). He endorsed an okay mood and no recent anger problems. (*Id.*). He was sleeping better and denied side effects from Latuda. (*Id.*). Mr. Jaeger reported some social anxiety and expressed being fearful of what others might think of him. (*Id.*). As before, Mr. Jaeger presented as calm, quiet, and pleasant, and was casually dressed and unshaven but otherwise appropriately groomed. (*Id.*). He displayed average social skills, no current psychosis, logical and coherent thoughts, and intact cognition. (*Id.*).

On December 12, 2016, Mr. Jaeger again reported doing well, endorsed an okay mood, and denied recent anger problems. (Tr. 250). Additionally, he claimed to be sleeping well. presented as calm, quiet, and pleasant, and was casually dressed and unshaven but otherwise appropriately groomed. (*Id.*). He displayed average social skills, improved psychosis, logical and coherent thoughts, and intact cognition. (*Id.*). Follow-up treatment notes dated January 9, 2017,

February 6, 2017, and March 6, 2017, reveal similar reports from Mr. Jaeger and similar findings on examination. (Tr. 248-250).

In April 2017, Mr. Jaeger met with Dr. Kausch and reported sleeping excessively, low energy levels, and feeling much apathy. (Tr. 247). He presented as calm, quiet, and pleasant, with logical and coherent thoughts, no current psychosis, and intact cognition; however, Dr. Kausch noted Mr. Jaeger exhibited below average social skills. (Tr. 247-248). In May, Mr. Jaeger reported continued apathy but denied behavior problems and psychotic symptoms. (Tr. 246-47). As before, he presented as calm, quiet, and pleasant, and displayed logical and coherent thoughts, intact cognition, and below average social skills. (Tr. 247). Dr. Kausch made similar findings on July 31, 2017, where Mr. Jaeger reported feeling pretty good, without behavioral problems or psychotic symptoms. (Tr. 245-46). Mr. Jaeger also endorsed going to bed very late at night and waking up in the early afternoon. (Tr. 245). Dr. Kausch continued his prescription for Latuda and also prescribed trazadone. (Tr. 246).

Thereafter, Mr. Jaeger engaged with treatment providers at Circle Health Services Southwest. In October 2018, Mr. Jaeger met with Judy Mbure, APRN, CNP. (Tr. 290-92). He reported a good mood, getting good sleep, having pretty good energy, and good concentration. (Tr. 291). Mental status examination revealed Mr. Jaeger was engaged and displayed a linear and goal-directed thought process without abnormal thought content or perceptual distortions. (*Id.*). Additionally, his cognition was intact, and he displayed good insight and no impairment in judgment. (*Id.*). He denied symptom exacerbation or new symptoms and displayed no evidence of psychosis or paranoia. (Tr. 292).

In January 2019, Mr. Jaeger met with Maria Elisa Javier Obias, APRN-CNS, where he reported having no psychotic symptoms for the last three months. (Tr. 289). Mental status examination was unremarkable. (Tr. 290). Ms. Obias determined his current medications were effective for control and relief of symptoms. (Tr. 290).

In February, Mr. Jaeger met with Linh D. Nguyen, Pharm.D., and reported a continued positive mood. (Tr. 287). He denied mood fluctuations and endorsed normal sleeping patterns. (Tr. 288). Mental status examination revealed largely normal findings, except blunted affect. (*Id.*). Mr. Jaeger followed up with Dr. Nguyen on March 21, 2019, where he endorsed some mood swings but denied psychosis. (Tr. 286-87).

On April 25, 2019, Mr. Jaeger saw James Ward, APRN, CNP, where he reported Latuda remained effective for mood stability and psychosis. (Tr. 284). He endorsed intermittent paranoid ideation, but stated it was not entirely bothersome. (*Id.*). Mental status examination revealed no evidence of psychosis and was otherwise normal, except he displayed a flat, constricted affect and poor eye contact. (Tr. 284-85). At a follow-up appointment on June 20, 2019, Mr. Jaeger endorsed feeling better than usual and reported Latuda remained effective for mood stability and psychosis. (Tr. 282). He denied problems with thought organization, inattentiveness, or task completion. (*Id.*). Again, mental status examination was largely normal, except he displayed a flat, constricted affect, poor eye contact, and decreased spontaneity of speech. (Tr. 283).

In October 2019, Mr. Jaeger returned to Circle Health Services Southwest after having been off his medication "for a while." (Tr. 280). Mr. Jaeger presented with poor grooming and hygiene, was guarded, and displayed a tangential and circumstantial thought process. (*Id.*). The provider was unable to assess Mr. Jaeger's thought content, perception, and orientation due to a

disorganized speech pattern. (*Id.*). His insight was absent to poor, and judgment was poor to fair. (Tr. 281). Morgan Wiggins, APRN, CNP, continued Mr. Jaeger's prescriptions. (*Id.*).

When Mr. Jaeger met with Diane Poppe, RN, in January 2020, he admitted to taking "a bunch of Latuda," but claimed it was an impulsive action and not an attempt at suicide. (Tr. 304). Otherwise, Mr. Jaeger was cooperative, engaged, and accessible, with linear and coherent thoughts, no abnormal thought content or perceptual disturbances, euthymic mood, intact cognition, moderate insight, and mildly impaired judgment. (Tr. 305). In February, Mr. Jaeger met with Nurse Poppe again and reported sleeping well. (Tr. 303). Mental status examination was normal. (Tr. 303-04).

In September 2020, Mr. Jaeger had a telehealth visit with Youstina Soliman, APRN, CNP, where he reported a neutral mood, good sleep, and "fair" anxiety related to waiting on approval for his disability application. (Tr. 343). To relieve stress, Mr. Jaeger endorsed putting together a computer, watching new television shows, and staying busy at home. (Tr. 344). He denied hallucinations for over a year. (Tr. 343). Mr. Jaeger reported better mood stabilization since his last appointment and did not wish to change his medications. (Tr. 345).

## III.  MEDICAL OPINIONS

Irma Johnston, Psy.D., a state agency consultant, reviewed Mr. Jaeger's mental health records through October 14, 2019, and determined Mr. Jaeger was not disabled. (Tr. 51-64). Dr. Johnston opined Mr. Jaeger had a mild limitation in his ability to understand, remember, and apply information, and moderate limitations in his abilities to interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. (Tr. 54). Dr. Johnston determined Mr. Jaeger is capable of performing simple tasks, occasionally multi-step tasks, in an environment

without strict time demands or high production quotas; capable of occasional and superficial interaction with coworkers and supervisors, and minimal interaction with the general public; and is capable of working in an environment with occasional non-routine changes. (Tr. 55-56). Mr. Jaeger's most current mental status examination revealed a disorganized speech pattern and tangential and circumstantial thoughts, but Dr. Johnston found it notable that Mr. Jaeger had been off his medication for some time before the mental status examination and observed his mental status examinations were better organized when he was compliant with medication.

Carl Tischler, Ph.D., another state agency consultant, reviewed two additional treatment records from January and February 2020 and determined Mr. Jaeger was not disabled. (Tr. 68-79). Dr. Tischler noted Mr. Jaeger's mood and mental status examinations improved when he took his medication and adopted Dr. Johnston's opinion. (Tr. 78).

## IV.  OTHER RELEVANT EVIDENCE

Mr. Jaeger's parents completed a Third-Party Function Report, dated October 30, 2020, outlining how Mr. Jaeger's mental impairment limits his activities. (Tr. 221-28). Mr. Jaeger lives with his parents. (Tr. 221, 225). They assert Mr. Jaeger has difficulty behaving normally in social situations and can get agitated, argumentative, angry, and display inappropriate laughter. (*Id.*). They also claim Mr. Jaeger's daily routine is variable because of disrupted sleep patterns. (Tr. 222). Mr. Jaeger sometimes remembers to take the dog out and feed him, but at other times he needs written reminders. (*Id.*). In terms of personal care, Mr. Jaeger's parents note that he does not change his clothes daily, does not spend time combing or caring for his hair, and will let his beard go untouched for a long time. (*Id.*). Sometimes, Mr. Jaeger showers daily and other times he neglects to do so for days. (*Id.*). His parents remind him to take his medications. (Tr. 223). Mr.

Jaeger can make microwave or frozen meals and sometimes cooks chicken or ground beef. (*Id.*). The time it takes him to make meals varies because Mr. Jaeger usually walks away several times while preparing meals. (*Id.*).

Mr. Jaeger's parents must remind and encourage him to complete chores, including raking leaves, doing laundry, sweeping his room, and retrieving the mail. (*Id.*). He often goes outside in the backyard where he can be alone. (Tr. 224). He does not drive and has not been anywhere by himself in over three years. (*Id.*). His mother attends medical appointments with him and takes him to the grocery store for curbside pickup. (*Id.*). Other than medical appointments, grocery store curbside pickup, and seeing his grandparents a few times, Mr. Jaeger does not go anywhere. (*Id.*).

While Mr. Jaeger has some hobbies, including listening to music, playing some video games, using the computer, and watching television, he does not spend a lot of time doing anything. (Tr. 225). Mr. Jaeger dropped out of school at age 16 because he could not handle the daily routine and had difficulty getting along with others. (*Id.*). Mr. Jaeger associates only with his parents and grandparents; even though his brothers and sister live with Mr. Jaeger, he does not have any relationship with them. (*Id.*). Mr. Jaeger's parents note his condition affects his memory, concentration, and understanding, and his abilities to complete tasks, follow instructions, and get along with others. (Tr. 226). As for following instructions, Mr. Jaeger does not like to be confronted with how to do things. (*Id.*). In the past, confrontation with authority figures have triggered behavioral issues, including fights. (Tr. 227). Mr. Jaeger's parents endorsed unusual behaviors including social withdrawal, extreme reactions to criticism, expressionless gaze, variable sleep patterns, and inappropriate laughter. (*Id.*). Mr. Jaeger takes Latuda, which causes restlessness,

slowed movements, and sleepiness, and Naltrexone, which causes sleep issues, headaches, and abdominal pain. (Tr. 228).

## V.    ADMINISTRATIVE HEARING

The following summarizes the testimony of Mr. Jaeger and VE Paula Zinsmeister, presented during the hearing before the ALJ.

Mr. Jaeger stopped going to school in the 10th grade. (Tr. 34). He stopped attending because he felt overwhelmed, had difficulty communicating and getting along with his teachers, and lacked motivation to complete the work. (Tr. 34-35). He explained he did not respond well in school if something did not go right. (Tr. 35). Mr. Jaeger tried to complete his schooling from his computer at home but had even less motivation to do the work in that environment. (Tr. 34).

Mr. Jaeger testified he worked at Ruby Tuesdays as a dishwasher three years before the hearing, for about six months. (Tr. 35-36). He was fired for going out for smoke breaks too often. (Tr. 36). Mr. Jaeger believes he cannot work a full-time job because the more that is expected of him, the more he feels fatigued; when his mind is exhausted, he has less control, feels he loses his sense of reality, and begins to question every little thing. (Tr. 39). When this happens, Mr. Jaeger must step away from the situation, let his mind calm down, and "restart." (Tr. 40). Mr. Jaeger expressed difficulty with struggling to explain his symptoms to his treatment providers. (Tr. 41).

Though Mr. Jaeger lives with his siblings, he does not communicate or do anything with them. (Tr. 42). Mr. Jaeger disagreed with his parents that he would not shower or change clothes for days; in fact, he claimed to be "actually a little OCD about showers and stuff." (Tr. 43). Mr. Jaeger also disagreed with his parents' statement that he had not gone anywhere alone in about

three years, stating he goes out two or three times a year. (*Id.*). Upon questioning from the ALJ, Mr. Jaeger endorsed not playing video or computer games much lately. (Tr. 45).

The VE then testified. The ALJ asked if a hypothetical individual of Mr. Jaeger's age and education could perform any work if restricted to performing simple tasks and following simple instructions without strict time demands or high production quotas; and can have frequent interaction with coworkers, occasionally interaction with the general public; and limited to a work environment where only occasional non-routine changes take place. (Tr. 47). The VE identified three positions the hypothetical individual could perform, including hospital cleaner (DOT 323.687-010), landscape laborer (DOT 406.687-010), and cleaner, housekeeping (DOT 323.687-014). (Tr. 47-48). The VE stated an individual who would be off task twenty percent of the workday and would miss, or be unable to complete, two or more days of work per month would be precluded from performing those identified positions, or any other jobs. (Tr. 48).

### THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2017.

2. The claimant has not engaged in substantial gainful activity since October 1, 2016, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3. The claimant has the following severe impairment: schizophrenia (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

11

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: except limited to performing simple tasks and following simple instructions with no strict time demands or high production quotas (i.e. assembly line work); can have frequent interaction with coworkers, but only occasional interaction with the general public; and there should be only occasional, non-routine changes to the workplace.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on October 2, 1993, and was 23 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968)

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2016, the alleged onset date, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-24).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &*

*Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures

and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

**STANDARD FOR DISABILITY**

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Mr. Jaeger claims the appointment of Andrew Saul as the Commissioner of the Social Security Administration violated the separation of powers and, as such, a written decision from an ALJ who derives his authority from Mr. Saul is constitutionally defective, entitling Mr. Jaeger to remand for a *de novo* hearing. (Pl's Br., ECF #8, PageID 397). Additionally, Mr. Jaeger argues the ALJ erred at Step Three and did not properly evaluate his symptoms in accordance with Social Security Ruling (SSR) 16-3p when assessing his residual functional capacity. (*Id.* at PageID 399-400, 405).

The Commissioner concedes the language in 42 U.S.C. § 902(a)(3) restricting the President's ability to remove the Commissioner only for "neglect of duty or malfeasance of office" violates the separation of powers because it limits the President's authority to remove the Commissioner without cause. (Comm'r's Br., ECF #10, PageID 417). However, the Commissioner argues Mr. Jaeger has not shown the kind of harm necessary to entitle him to remand. (*Id.* at PageID 418). As to Mr. Jaeger's disability-related arguments, the Commissioner asserts the ALJ appropriately analyzed the evidence in light of the relevant Listing of Impairments at Step Three (*Id.* at PageID 426), and substantial evidence supports the ALJ's residual functional capacity finding that was based on evaluation of Mr. Jaeger's impairments and his subjective symptoms. (*Id.* at PageID 431).

15

As explained below, I agree with the Commissioner and conclude that, as to § 902(a)'s removal provision, Mr. Jaeger has not shown the harm necessary to entitle him to remand for a *de novo* hearing. Moreover, after review of the record and affording all due deference to the ALJ's conclusions, I find that substantial evidence supports the finding of non-disability and am not persuaded by Mr. Jaeger's argument that this finding rests on an improper analysis of the record. I therefore **AFFIRM** the Commissioner's decision.

## I.     The Constitutional Challenge

Initially, I conclude Mr. Jaeger has not forfeited his ability to raise his constitutional challenge even though he did not advance this argument at the administrative level. (*See* Pl.'s Br., ECF #8, PageID 398). In *Carr v. Saul*, 141 S. Ct. 1352 (2021), the Supreme Court held a claimant does not need to exhaust a constitutional claim at the administrative level, but instead may present such a claim for the first time at the district court level. *Id.* at 1362. But Mr. Jaeger is still not entitled to an order of remand from this Court on the basis of his constitutional challenge.

In *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2197 (2020), the Supreme Court found that a statutory restriction on the President's ability to remove the head of an agency "only for inefficiency, neglect, or malfeasance" violates the separation of powers and is unconstitutional. The Court further found the offending clause was severable from the other portions of its Act, thereby maintaining CFPB intact as an agency. *Id.* at 2208, 2211.

Subsequently, in *Collins v. Yellen*, 141 S.Ct. 1716 (2021) the Court considered the Federal Housing Finance Agency (FHFA) and its enabling statute, which contained a provision stating that the head of FHFA was removable by the President "only 'for cause.'" *Id.* at 1770. The Court concluded such a provision violated the separation of powers and was unconstitutional. *Id.* Relying

on *Seila Law,* the Court further explained the unconstitutionality of a removal provision does not strip an agency head of the authority to carry out the other functions of the office. *Id.* at 1788; *see also id.* at n.23 ("Settled precedent also confirms that the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office . . . .") (citing *Seila Law,* 140 S.Ct. at 2207-11). Instead, to obtain remand, the plaintiff must demonstrate "compensable harm" flowing from the unconstitutional removal clause. *See id.* at 1788-89. The absence of a nexus between the purported harm and the challenged removal restriction "defeats the . . . argument for setting aside" agency action. *See id.* at 1787.

Mr. Jaeger claims he did not receive a valid administrative process because the ALJ's authority to make disability determinations was derived from a Commissioner who was subject to an unconstitutional removal provision. (Pl.'s Br., ECF 8, PageID 395). Mr. Jaeger asserts he was harmed by the improper appointment of the Commissioner and the modifications to the Social Security process that were implemented during Mr. Saul's tenure, though he does not articulate what changes affected his case. (*Id.* at PageID 396). Mr. Jaeger also asserts that when President Biden terminated Mr. Saul, he noted that Mr. Saul "had undermined and politicized Social Security disability benefits." (Pl.'s Br., ECF #8, PageID 545). Because of this, Mr. Jaeger argues that "it can be inferred that the policy adjudication framework and processes established by Mr. Saul was the primary and lead reason for President Biden's dissatisfaction." (*Id.*). However, again, Mr. Jaeger does not explain how this affected his specific case. Mr. Jaeger was required to trace the ALJ's unfavorable decision to the unlawful conduct, and he failed to do so. These arguments are, therefore, without merit.

As in *Collins,* the existence of an unconstitutional removal provision did not strip Commissioner Saul of his authority to carry out the functions of his office, including the authority to delegate disability determinations to ALJs and to implement changes to Agency regulations. Without a showing that § 902(a)(3)'s removal restriction inflicted specific, compensable harm on him, remand for a *de novo* hearing is not available to him.

Other federal courts in this judicial district, this state, and across the country, have concluded that the allegedly unconstitutional appointment of Andrew Saul does not require remand absent a showing of compensable harm. *See, e.g., Katrina R. v. Comm'r of Soc. Sec.*, No. 2:21-CV-4276, 2022 WL 190055, at *5 (S.D. Ohio Jan. 21, 2022) (collecting cases); *Miley v. Comm'r of Soc. Sec.*, No. 1:20-CV-2550, 2021 WL 6064754, at *9 (N.D. Ohio Dec. 22, 2021); *Michelle D. v. Kijakazi,* No. 21-CV-1561, 2022 WL 972280, at *6 (N.D. Ill. Marc. 31, 2022); *Michael H. v. Comm'r of Soc. Sec.*, No. 1:20-cCV-1466, 2022 WL 768658, at *15-18 (W.D.N.Y. Mar. 14, 2022). I similarly decline to remand on this basis.

Mr. Jaeger relies on *Tafoya v. Kijakazi,* No. 21-CV-871, 551 F. Supp. 3d 1054 (D. Col. July 29, 2021) for the proposition that the ALJs "were operating without constitutional authority and their determinations were null." (Pl.'s Br., ECF #8, PageID 397). The *Tafoya* Court, however, merely held that a plaintiff had standing to litigate her constitutional challenge to the removal provision. *Id.* at 1062. Indeed, the court expressed doubt that the plaintiff would succeed on the merits. *Id.* at 1059 ("While ultimately, the righteousness *vel non* of her arguments on the merits may gain plaintiff little, if anything, the question before me is one of standing, and thus does not implicate the merits.").

Because Mr. Jaeger has not articulated a specific, compensable harm sustained as a result of the unconstitutional removal provision in § 902(a)(3), the constitutional challenge fails.[1]

## II.  At Step Three, the ALJ reasonably concluded Mr. Jaeger's impairments do not meet a Listing

The Step Three analysis centers on the medical severity of a claimant's impairment and whether a claimant meets a listed impairment. 20 C.F.R. § 404.1520(a)(4)(iii). The listings include over a hundred conditions the Social Security Administration considers "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a); *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013). The listings work to "streamline the decision process," shifting the focus onto the claimant's impairment and away from the ability to work. *Sheeks*, 544 F. App'x at 641 (quoting *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987)).

If a claimant's impairment meets the description of a Listing or its equivalent, the claimant will be found disabled. *Bowen*, 482 U.S. at 141 (1987); *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). "[F]or a claimant to show that his impairment matches a listing it must meet all of the specified

---

[1]    Given this determination, it is unnecessary for me to address the Commissioner's alternative arguments opposing Mr. Jaeger's constitutional challenge (harmless error doctrine, de facto officer doctrine, rule of necessity, and broad prudential considerations). (Comm'r's Br., ECF # 10, PageID 573-76). *See, e.g.*, *Cary v. Mox*, No. 17-cv-12862, 2018 WL 4402939, at *10 n.6 (E.D. Mich. Aug. 14, 2018) ("Because Defendants Washington and Leach are entitled to summary judgment on the basis of exhaustion, and in the interest of judicial economy, the Court does not reach their alternative arguments for dismissal or summary judgment."), *report and recommendation adopted*, 2018 WL 4385793 (E.D. Mich. Sep. 14, 2018); *see also Butcher v. Comm'r of Soc. Sec*, No. 2:20-CV-6081, 2021 WL 6033683, at *8 (S.D. Ohio Dec. 21, 2021) ("Plaintiff's separation of powers claim lacks merit. Accordingly, the Undersigned does not reach the Commissioner's alternative arguments including harmless error, de facto officer, the rule of necessity, and other prudential considerations."), *report and recommendation adopted*, 2022 WL 523519 (S.D. Ohio Feb. 22, 2022).

19

medical criteria," *Zebley*, 493 U.S. at 530, and it is not enough that a claimant comes close to meeting or almost meets the requirements of a Listing. *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986). The claimant bears the burden of establishing every element of the specified criteria. *Bowen*, 482 U.S. at 146 n.5; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

When evaluating whether a claimant's impairment meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant Listing], and give an explained conclusion, in order to facilitate meaningful review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). To obtain remand, "A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x at 641-42 (6th Cir. 2013)).

Here, having found Mr. Jaeger's schizophrenia to be a severe impairment at Step Two, the ALJ analyzed Mr. Jaeger's condition in accordance with Listing 12.03. According to the Listings, schizophrenia spectrum disorders are characterized by delusions, hallucinations, disorganized speech, or grossly disorganized or catatonic behavior, causing a clinically significant decline in functioning. Symptoms and signs may include, but are not limited to, inability to initiate and persist in goal-directed activities, social withdrawal, flat or inappropriate affect, poverty of thought and speech, loss of interest or pleasure, disturbances of mood, odd beliefs and mannerisms, and paranoia. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00B2.

For a condition to meet a Listing, the claimant must satisfy the paragraph A and paragraph B criteria, or paragraph A and paragraph C criteria of the Listing. *Id.* at 12.03. Mr. Jaeger has not alleged that he met the criteria of paragraph C. To satisfy paragraph A, the claimant must show

medical documentation of delusions or hallucinations, disorganized thinking (speech), or grossly disorganized behavior or catatonia. *Id.* To satisfy paragraph B, the claimant must show an extreme limitation of one, or marked limited of two, of the following areas of mental functioning: understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* Mr. Jaeger claims he satisfies paragraph B because he has marked limitations in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Pl.'s Br., ECF #8, PageID 401).

The ALJ determined Mr. Jaeger is moderately limited in his ability to interact with others because although he alleged difficulty engaging in social activities and getting along with others, he can live with his parents, be pleasant and cooperative in the presence of his treatment providers, and can present to those treatment providers with average social skills. (Tr. 17). The ALJ also found Mr. Jaeger is moderately limited in his ability to concentrate, persist, or maintain pace because he can play video games and the record contains evidence of intact cognition, normal attention span and concentration, and logical, linear, and coherent thoughts when he met with his treatment providers. (Tr. 17).

Although Mr. Jaeger asserted difficulty handling change and managing his mood, the ALJ determined he is moderately limited in his ability to adapt and manage himself because he stated he is able to handle self-care and personal hygiene and displayed a euthymic mood, full affect, and calm presentation when meeting with his treatment providers. (Tr. 17).

Mr. Jaeger asserts the evidence cited by the ALJ does not support his conclusions, and points to other evidence he claims supports a determination that he has more than moderate

limitations in at least three areas of mental functioning, including evidence from Mr. Jaeger's parents that he has a difficult time behaving normally in social situations, sometimes needs written reminders to care for the family dog, has some issues with hygiene, and that Mr. Jaeger's mother accompanied him to his appointments. (Pl.'s Br., ECF #8, PageID 400). Additionally, he points to his testimony that he does not play video games much. (*Id.*). Mr. Jaeger also takes issue with the minimal daily activities the ALJ cited in support of his paragraph B conclusions. (*Id.* at 403).

The ALJ appropriately assessed the paragraph B factors to conclude Mr. Jaeger does not meet Listing 12.03. The ALJ found Mr. Jaeger was moderately limited in all areas and supported each of his findings with citations from the record, including citations to some daily activities and objective medical evidence in the form of numerous mental status examinations. His findings are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, *i.e.*, substantial evidence. *Besaw*, 966 F.2d at 1030. Moreover, it is not within the province of the district court to re-weigh the evidence. *Brainard*, 889 F.2d at 681. Even if a preponderance of the evidence supports Mr. Jaeger's position that he is markedly limited in those areas of mental functioning, the court cannot overturn the ALJ's conclusion "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Mr. Jaeger claims the ALJ failed to take into account the entire record regarding his waxing and waning symptoms, including but not limited to paranoia, hallucinations, social anxiety, mood instability, generalized apathy, impulsivity, irritability, anger, thought-disorganization, impaired insight and judgment, below average social skills, a flat and constricted effect, poor eye contact, and tangential and circumstantial thought process. (*Id.* at PageID 402). Contrary to Mr. Jaeger's

assertion, the ALJ placed Mr. Jaeger's symptoms in a chronological context and found the symptoms fluctuated when he failed to remain medication compliant but stabilized and remained largely static when he took his medications. (Tr. 20, 21).

III.    **The ALJ properly evaluated Mr. Jaeger's symptoms in accordance with SSR 16-3p.**

An ALJ follows a two-step process for evaluating an individual's symptoms. In Step One, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. In Step Two, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ considers all relevant evidence, including

(1)    a claimant's daily activities;

(2)    the location, duration, frequency, and intensity of pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

(6)    any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

(7)    any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

*Id.*

The ALJ is not required to analyze all seven factors, but only those that are germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)

("The ALJ need not analyze all seven factors identified in the regulation but should provide

enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints, and may discount

the claimant's subjective testimony when the ALJ deems it inconsistent with objective medical and

other evidence. *Jones*, 336 F.3d at 475-76. The ALJ's decision must include "specific reasons for the

weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any

subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-

3p. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole

why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617,

2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v.*

*Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and

deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a

claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review.

*Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of

the claimant's subjective complaints, or the conclusions drawn from it. *Baumhower v. Comm'r of Soc.*

*Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ

cited substantial, legitimate evidence to support his factual conclusions, we are not to second-

guess[.]" *See Ulman*, 693 F.3d at 713-14.

Here, the ALJ considered Mr. Jaeger's statements about the intensity, persistence, and

functionally limiting effects of his symptoms, including the statement that he cannot work because

it would fatigue him and he feels less in control when his mind is tired, but concluded that his

24

statements were not entirely consistent with the medical and other evidence in the record. (Tr. 18).

The ALJ determined Mr. Jaeger's statements as to his level of limitation were not supported by the

objective medical findings, including intact memory and cognition, normal attention span and

concentration, logical thought process, a pleasant and cooperative demeanor, and no evidence of

psychosis or paranoia. (Tr. 21). Notably, the ALJ found Mr. Jaeger's symptoms stabilize with

treatment and pointed to Mr. Jaeger's own statement that his medication was effective for mood

stability and psychosis. (Tr. 20, 21).

For those same reasons, the ALJ discounted the entire body of observations contained in

the Function Report from Mr. Jaeger's parents. (Tr. 22). Compared to the ALJ's residual

functional capacity assessment, the Function Report paints a substantially less rosy picture of Mr.

Jaeger's daily life and the limitations posed by his mental health impairment. However, the ALJ is

entitled to discount subjective evidence when he deems it inconsistent with other evidence, *Jones*,

336 F.3d at 475-76, and the ALJ's conclusions are afforded great deference. *Ulman,* 693 F.3d at

714. Given that the ALJ considered all relevant evidence in evaluating Mr. Jaeger's symptoms and

adequately articulated the basis for his conclusions—Mr. Jaeger's mental status examinations and

the stabilization of symptoms with medication compliance are inconsistent with the subjective

evidence (Tr. 22)—I am constrained to uphold the ALJ's analysis.

Based on the foregoing, Mr. Jaeger's arguments that the ALJ did not properly evaluate the

evidence and failed to articulate a rationale for discrediting the subjective evidence beyond the

boilerplate paragraph are unpersuasive. The record evidence suggests Mr. Jaeger has functional

limitations resulting from his mental impairments. But the substantial evidence standard of review

is a constraining one in which courts must give significant deference to the ALJ's "zone of choice."

*Mullen*, 800 F.2d at 545. Given that the ALJ adequately explained his Step Three findings and considered the relevant evidence in evaluating Mr. Jaeger's symptoms, I cannot step into the ALJ's shoes and reweigh or reevaluate the evidence.

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** Commissioner's decision denying disability insurance benefits and supplemental security income.

**SO ORDERED.**

Dated: December 2, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE